UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

       *Plaintiff,*

vs.                                                         Case No. 20-cr-30

TRAVIS GREIL,

       *Defendant.*

---

**SENTENCING MEMORANDUM**

Travis Greil, by counsel, files this memorandum in support of a six-year sentence. This is a difficult sentencing memo to write, and (I imagine) an even more difficult case to judge. It is far from the typical federal case. But while the facts are unusual for federal court, Greil is not escaping the substantial prison sentences common for federal offenses. The parties have, in fact, agreed that his behavior calls for at least six years of incarceration. The question at sentencing centers on whether his behavior warrants a prison term beyond six years.

**I.**     **Introduction**

Before addressing the specific reasons that six years accords with the § 3553(a) factors, there are two pieces of evidence I believe provide the best insight into the case and the need to punish Greil. Before reading this memo, I hope that the Court will consider looking at both. The first is Greil's statement to law enforcement given minutes after he turned over the iPad. It's about twenty minutes long and it provides a candid insight into what Greil was feeling—well before he had any inkling of what he was facing. It is attached as Exhibit A, along with the transcript.

The second is Greil's psychosexual exam, which provides specific insights into Greil's motivation for this crime. Ex. B at 14 ("He described feeling emotionally numb with dysphoric symptoms…Video voyeurism appeared to be used as a maladaptive coping strategy."). The evaluation also addresses whether Greil secretly (and incessantly) sought to create images of child pornography or whether this was something else—namely, voyeurism. To that end, it notes: "Greil's offenses are specifically related to voyeuristic interests and were not motivated by a desire to create child pornography…Had this been his actual underlying motivation, he would have altered his behavior to better capture nude child images or seek nude child images using other methods." *Id.*

The fact that Greil wasn't looking (and repeatedly failing) to produce child pornography doesn't absolve him of responsibility, but it matters. The danger he poses to society would stem from an abiding attraction to children—an attraction he doesn't have. An extensive search through all of Greil's devices failed to uncover a single image of child pornography or shred of evidence that would indicate Greil had a sexual interest in children. Instead, as the evaluation makes clear, he was in a very depressed and dark place and he used this criminal behavior for a brief escape or lift. *Id.* at 12 ("[Greil used] voyeurism to cope with negative emotions (e.g., achieving an adrenaline surge) and/or dissatisfactory life circumstances."). The behavior was wrong, it was disgusting, and it was criminal, but it was not Greil satisfying a sexual urge directed towards children. It was, instead, the manifestation of deeply seeded, untreated mental-health issues that he sought to momentarily escape through voyeurism.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Again, that does not excuse Greil's behavior or allow him to escape punishment (he's getting at least six years in prison); but it does give his crime necessary context and informs how much *more* punishment Greil needs. That context isn't just a product of the interview and the psychosexual exam, it's also seen throughout the PSR and the letters from his family. To that end, the defense submits that when the Court weighs the § 3553(a) factors, six years is an appropriate sentence.

## II. The facts surrounding Greil's crime, as detailed by the Presentence Report, discovery, and psychosexual exam.

The PSR gives an excellent overview of Greil's life. He worked hard and overcame a lot to become a well-respected and accomplished teacher. PSR ¶¶ 78–83. He loved what he did. He had the markings of a good life—a good career, a family, and the respect of the community. But he also had a lifelong battle with mental illness. *See id.* ¶ 91. That is unsurprising. Depression runs deep on both sides of his family—he lost a grandparent on both sides to suicide, and it took his youngest brother from him in 2012. *Id.* ¶ 78, 81. Despite this history of mental illness and the need for help, Greil only sporadically sought counseling. *Id.* ¶ 93. Instead, in his twenties, he (destructively) tried to drown out the suicidal thoughts with alcohol. *See id.* ¶ 97, 105. Eventually, he re-evaluated things. The birth of his daughter brought both joy and a moment of clarity—he couldn't continue blackout drinking, and he couldn't take his own life. *Id.* At this point (and at many points along the way), the best place for Greil to turn would have been a therapist. But instead, he "white-knuckled" his mental-health issues and tried to put on a good face for the

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

world. Yet, his family saw his struggles and how often he was overcome by it all. *See id.* ¶ 95.

We are, of course, talking about a person's struggles over a ten-year period, so nothing is homogenous—he wasn't always on the brink nor was he always enjoying tranquility and fulfillment. Instead, like most, he went through peaks and valleys, some lasting longer than others did. His peaks were marked with professional accomplishment, wonderful times with his family, and being a well-contented human being; but his valleys were marked by locking himself in the bathroom for hours, struggling with nervous shakes, and adopting an apathetic malaise. *See* Ex. B at 12-14; *see also* PSR ¶ 91. While those behaviors portended the need for help, he wasn't heeding those signs and seeking therapy. From the PSR, the arrest interview, his family's letters, and the psychosexual report, it seems clear that Greil has struggled for years and years with depression and anxiety and that at times it was overwhelming. PSR ¶¶ 91–104.

**A. The evidence establishing Greil does not have a sexual interest in children.**

This Court must wrestle with a difficult question: is Greil a dangerous individual with a sexual interest in children, or is his behavior the byproduct of maladaptive behavior stemming from years of untreated mental-health struggles. The answer will bear heavily on the sentencing analysis, and there are four points that show that the latter is more accurate.

First, listening to his interview with Officer Wierzbanowski and Dr. Nye, it's clear that Greil felt this was all linked to his mental health:

4

- "[Y]ou'll be able to see from the files, like, there's times where I stop because I feel better, and then there's times that it—it starts, and then it stops, and then it starts." Ex. A at 18.

- "[T]here's times that I feel really up and, then—like I—I don't do this and it's gone and, like I—then there's times when I—I feel—I feel down, and that's when, like, I—I—I do this. And it—it—I guess it's just kind of—it's like—it's like a thrill or something." *Id.* at 35.

- "[S]ometimes, like, I think this kind of takes—it took the place of—of those intrusive thoughts—and the thoughts of, like, harming myself." *Id.* at 39.

Even the school resource officer recognized where this was all coming from:

- "I understand where you're coming from. I mean, everybody has highs and lows, and you had said earlier that you're suffering from some depression and things like that, so obviously this kind of plays with it." *Id.* at 15.

- "I would like to call it, like, an illness or something you've been dealing with, kind of like depression. And, you know, it is an illness." *Id.* at 18.

- "You've admitted you've had some depression in the family. You've had several traumatic incidents that have happened to you. For as different as that may seem, this is your way of dealing with it. I don't walk in your shoes, and *I don't feel what you feel; but I've done my job a long time, and for you, this is your self-medication*." *Id.* at 47 (emphasis added).

Again, that interview is not years or months after his arrest, but *minutes* after turning over the iPad, before anyone (including Greil) knew the extent of what he'd done. His shock at the number of images captured shows how unaware he was of his problem. Ex. A. at 34-35 ("Oh my God. Yeah. Okay. I didn't even realize there was that many.").

Second, the investigation turned over every aspect of Greil's life—the investigators combed through every device. And there was *no* evidence of videos or images of child pornography. There is nothing that showed a sexual interest in children—no web

5

searches, no chatrooms, nothing. *See* PSR ¶¶ 27-28. His criminal behavior was isolated to upskirting at work.

Third, the timestamps from the videos point to this being a coping mechanism—there are clear highs and lows. When things were "okay," he would never do something like this. He was a committed and upstanding teacher. But when he was in the midst of his personal struggles, he "self-medicated" through the "thrill" of upskirting. *See* Ex. A at 14. Admittedly, we are dealing with a lot of videos, so the sheer number of files makes it seem like this was a regular act. But given that this was over a five years period, the number of videos is a poor indicator of how often he was doing this. Here is a chart of videos' dates, broken down by month: [1]



---

[1] I want to be clear on the chart, we want with days that he engaged in this rather than videos recorded. The point is that this was tied to his changing mental health needs. Lest the Court or anyone have a wrong impression by the graph, there are three additional graphs attached at the end of this memo. They are in landscape view and easier to see. The first is this graph, stretched out; the second, is the precise number of videos taken each month (not days he did this); and the third is the two graphs overlapped.

There are months where Greil almost never does this. In fact, in 2017 there were only two days where he engaged in this behavior. And then there are months when he does this nine or ten times. This, of course, backs up Greil's statements from the first night: "[Y]ou'll be able to see from the files, like, there's times where I stop because I feel better, and then there's times that it—it starts, and then it stops, and then it starts." Ex. A at 18.

Fourth, the psychosexual exam found that he has no pedophilic or hebephilic disorders. Ex. B at 14. He's not attracted to minors. Instead, he engaged in the maladaptive coping mechanism of voyeurism. *Id.* ("Mr. Greil exhibited a problematic coping and problem-solving strategy to interpersonal and emotional stressors…He utilized maladaptive coping when feeling numb or depressed by engaging in voyeuristic behaviors, which made him feel excitement."). This is important because it affirms what the other evidence shows: Greil was not seeking to target children. In the midst of his depression, voyeurism provided him with a momentary rush. *See id.* In the same vein as some people cut themselves or shoplift for that momentary relief, Greil did this.

Again, that's not an excuse. Just because a person does this out of the need for a momentary reprieve from depression and anxiety doesn't mean it's not criminal. But it does take this out of the realm of someone who took these images to supplement his child pornography collection, or of someone who exploits children to satisfy pedophilic desires. Instead, within the confines of his environment, he created a momentary rush or life. If Greil had been in a different career (an attorney) he would have targeted whoever was wearing a dress in the office—most likely an adult. It just so happened that he

worked at a school, and so he took pictures of high school students; and when the opportunity presented itself, a fellow teacher. PSR ¶ 32.

### B. Balancing Greil's criminal activity against the § 3553(a) factors establishes a sentence of six years is appropriate.

Drawing this distinction between Greil's criminal behavior and the typical producer of child pornography is important; it weighs heavily in the punishment analysis. A longer prison term would be necessary both the deter Greil and keep society safe, *if* he had an interest in children. But he doesn't have that abiding interest, and a prison term of six years provides more than sufficient time to deter Greil and keep the public safe from him.

The real driver for sentencing will be retribution—punishment for the sake of punishment. Greil hurt his students; he betrayed their trust; and he violated their dignity by invading their privacy. For that, he has to be punished. Losing his career, his good name, and his family isn't enough—the parties agree this is a prison case. Yet there is no escaping the fact that six years seems like a long sentence for this behavior. I qualified that statement with "seems" because there aren't many cases in this district with similar facts, and it doesn't fit within the normal rubric of cases we see. In fact, it's the district's first obscenity case in decades. It's *sui generis*.

To that end, it doesn't have the markings of a normal child-pornography case. Greil doesn't have a collection, he didn't share these images, and he didn't have any physical contact with the minors. Those are the hallmarks of child pornography cases, but they aren't present here. Instead, he invaded people's privacy and surreptitiously

recorded videos of the minors' and a faculty member's underwear. That's a terrible thing to do—it is rotten and disgusting. But when the Court mentally surveys other (terrible) conduct which results in a six-year (or less) sentence, a sentence of six years stands as appropriate for Greil. It's a lot of time, and it ensures justice for the victims—they know that this will never be tolerated and that Greil's getting what's due: a lengthy prison term.

That sentence also appropriately balances what was going on in Greil's life that prompted this. To the extent this behavior stems from Greil's very real mental-health struggles, it reduces the need to punish him. To be clear (bordering on repetitive), the fact that Greil did this in response to his often crippling anxiety and depression doesn't justify his behavior, but it does mitigate it. Greil wasn't putting on the façade of being a good and caring teacher so he could prey on kids and get videos of their underwear. Instead, he was a good and caring person, who in his mid-thirties became completely overwhelmed by his untreated mental-health struggles. And in the midst of those struggles, he choose to engage in this behavior as a maladaptive coping mechanism.

To the extent that is true (and the defense submits it is), then this behavior does not wipe out the good that defined his life before his arrest. Instead, the Court can be confident that when Greil leaves prison, he will live a life committed to serving the community—albeit in a much different form. The beauty of this experience and this prosecution is that it brought to the forefront not just Greil's crime, but also his need for help. This sentence gives him the time to work on himself and accept the need he has had (and continues to have) for intense therapy. Indeed, his letter, the psychosexual, and his family's letters all speak to the fact that he wants to pursue this new beginning. And

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

weighing all of that against § 3553(a)'s command to impose a sentence that is sufficient but not greater than necessary, the defense submits that six years satisfies that demand.

### C. The Guidelines do not provide a helpful starting point for thinking about this sentence.

The defense has filed its legal response to the Guideline change, and it will not be repeated here. The defense submits that the PSR had it right the first time. But even if the Court disagrees with the defense's reasoning, the production of child pornography Guidelines do not provide a good starting point. For one, they have been consistently criticized as being out of touch with sentencing trends and were instead a political response to Congress and not part of the Commission's institutional expertise. *See United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) ("[T]he Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts."); *see also United States v. Diaz*, 720 F. Supp. 2d 1039, 1044-46 (E.D. Wis. 2010).

Even accepting they can be right in the appropriate case, the Guidelines are meant to capture the "heartland of behavior"—what we normally see with a production of child pornography charge. *See United States v. Cooper,* 461 F.3d 850, 855 (7th Cir. 2006) ("The heartland has been defined as the set of typical cases embodying the conduct that each guideline describes."). And that's just not present here. To the extent that the Guidelines are meant to capture the heartland of criminal behavior for this charge, they are inapplicable here. Greil's behavior falls far outside the norm for production of child

pornography cases. And thus the Guidelines don't provide a good gauge (or starting point) for how Greil should be punished.

Instead, the defense submits that the Court has to gauge the appropriate amount punishment by referencing § 3553(a)'s commands and the Court's independent judgment; balancing the needs of the community with the needs of the defendant. And while the Guidelines don't offer much help to arriving at that number, the Court can consider two factors that inform how voyeurism is punished. First, there is a federal voyeurism statute (though not concerning minors), which provides a statutory maximum sentence of one year. *See* 18 U.S.C § 1801. Second, the appropriate state charge that Greil faced was an invasion of privacy of a minor which carries a maximum sentence of three years, with 18 months of initial confinement, followed by 18 months extended supervision. *See* Wis. Stat. § 942.08(4) (invasion of privacy statute; maximum term of confinement 18 months); *see also* § 942.09(2) (representation depicting nudity statute; maximum term of confinement 18 months). The defense is not asking for either sentence here or trying to argue that he would get 18 months in state court, so he should get it here. Pointing out the statutory penalties for voyeurism (invasion of privacy) is only meant to give a sense of where legislatures (both state and federal) have fixed the appropriate *maximum* sentence when they decided how to punish Greil's behavior.

### III. Conclusion

I began this memo noting that this was a difficult case to judge. It is. Experience teaches that courts often have a range that comes with having repeatedly seen the same sorts of cases with (somewhat) similar dynamics. This case doesn't lend itself to such comparisons. On top of that, the Court has a first-time offender, who had lived a very productive life and someone who struggled with very real mental-health issues. In addition to all of that, Greil has hurt the victims and that has to be punished. When the Court considers (and balances) all of the § 3353(a) factors of this unique case, six years is an appropriate sentence.

Dated at Madison, Wisconsin this 11th day of August, 2021.

Respectfully submitted,

Travis Greil, Defendant

*/s/Joseph A. Bugni*
Joseph A. Bugni

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
Joseph_bugni@fd.org

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.



Days per Month Images Captured

Comparison of Days and Images Captured
Days
Images
JAN. 2016
FEB. 2016
MAR. 2016
APR. 2016
MAY. 2016
JUN. 2016
JUL. 2016
AUG. 2016
SEP. 2016
OCT. 2016
NOV. 2016
DEC. 2016
JAN. 2017
FEB. 2017
MAR. 2017
APR. 2017
MAY. 2017
JUN. 2017
JUL. 2017
AUG. 2017
SEP. 2017
OCT. 2017
NOV. 2017
DEC. 2017
JAN. 2018
FEB. 2018
MAR. 2018
APR. 2018
MAY. 2018
JUN. 2018
JUL. 2018
AUG. 2018
SEP. 2018
OCT. 2018
NOV. 2018
DEC. 2018
JAN. 2019
FEB. 2019
MAR. 2019
APR. 2019
MAY. 2019
JUN. 2019
JUL. 2019
AUG. 2019
SEP. 2019
OCT. 2019
NOV. 2019
DEC. 2019
JAN. 2020
FEB. 2020



